Plaintiff has challenged provisions of the final rule that the Supreme Court upheld under statutory authority that has not changed. The two subsequently enacted statutes that plaintiffs say upended the statutory authority are fully consistent with the final rule. Okay. So, first of all, I have a question. The District Court entered an order on the government's motion to dismiss in this case on Thursday, September 12th. On the motion to dismiss, correct? Yes, Your Honor. Well, I'm surprised that nobody brought that to the Court's attention, first of all. Second of all, does it impact what we're arguing about here today at all? I note that it dismissed counts 4 and 10. Yes, Your Honor. It dismissed counts that are not at issue in this case. Okay, thanks. But it should not, and apologies if the Court, for not bringing that to the Court's attention. But, Your Honor, turning to the provisions of the rule at issue in this case, and the two subsequent enactments that plaintiffs say upended the agency's authority to... You know they're not arguing about the agency's authority. They're arguing about the legality or illegality of what the agency has exercised its authority to do. Do you understand that? Yes, Your Honor. The challenge before the Court is whether the final rule is consistent with the statute. Rust upheld the agency's authority to adopt virtually identical, if not more restrictive restrictions on the Title X program. And so, the authority of the agency to adopt materially similar restrictions is precisely what's before the Court. The two provisions that plaintiffs point to, the non-directive counseling provision of the appropriations rider, and the provision of the Affordable Care Act, do not alter the agency's authority to adopt precisely these. Right. Because this case is not about the agency's authority. It's about whether it has exercised its authority in an illegal manner, and that's why it's so important that the Affordable Care Act and the non-directive came after Rust. Yes, Your Honor. You have to address how that's legal. Yes, Your Honor. The final rule is fully consistent with both of those statutes, and I can explain why. The final rule does not prohibit any sort of pregnancy counseling that Baltimore wants to engage in. It prohibits, like the final rule upheld in Rust, abortion referrals, which are not under the terms of the appropriations rider, or as a matter of logic, part of pregnancy counseling. How is that not part of pregnancy counseling? Your Honor, this is a term of arts that the agency has used, and even I would refer you to... What's a term of art? ...that non-directive counseling refers to a set of activities that do not include referral, and I'd refer you to the 2,000 regs that plaintiffs would prefer. So how do you define counseling? Counseling is the presentation of information about options related to a Title X patient's pregnancy. Referral is a separate activity. Well, isn't abortion an option related to pregnancy? It is legal. Yes, Your Honor. It is an option, and Title X grantees are permitted to discuss that with their clients under the final rule. How are they permitted to discuss that with their clients? The final rule permits a Title X grantee to engage in non-directive pregnancy counseling, including counseling about abortion. What it prohibits is for a Title X grantee to refer a Title X patient for abortion as a method of family planning, but it permits referrals in the cases of medical necessity, rape, or incest. It doesn't... It also doesn't allow... And the referral list does not include physicians that perform abortions. Is that correct? No, Your Honor. It is incorrect. Or at least it doesn't let the patient know which physicians could perform abortions. That's right, Your Honor. So, how is that any sort of meaningful counseling in the physician-patient relationship? It's not, because the rule prohibits referrals for abortion as a method of family planning. The rule then permits a provider to provide information about prenatal services provided outside of... Right, but not abortions. So, that seems like not neutral. You refer for prenatal counseling, carrying the pregnancy to term, but no referrals for abortion doctors. Exactly, Your Honor. So, the rule prohibits referrals... Well, isn't it supposed to be a neutral situation in terms of the referrals? That's not neutral. No, Your Honor. That's not what Congress has required. Congress has required that pregnancy counseling, an activity distinct from referrals, as the position in the 2,000 regs that plaintiffs would prefer... Counseling and referral are not, in any other physician-patient context, separate. Your Honor, I can't speak to any other patient-provider relationship, but in the context of the Title X program, the agency's position has been, and even under the 2,000 regs that plaintiffs would prefer, that referrals and counseling are distinct, and that the non-directive counseling... Doesn't Congress include referrals as part of counseling? No, Your Honor. We have, as we read through the issue, that Congress has referred to referrals and counseling as the agency has in a distinct way, to the extent that it has referred to both at the same time. We think that that's because Congress acknowledges these are two separate activities. I'd point, Your Honor, to, in particular, the legislative attempts to overturn the agency's authority, acknowledge and rust, and there, in the legislative proposals that would have overturned that authority, Congress referred to counseling and referrals distinctly. What does Congress mean when it says the Secretary shall make grants to adoption organizations, this is in a separate statute, for the purpose of providing adoption information referrals to pregnant women on an equal basis with all other courses of action included in non-directive counseling? That sounds like information and referrals is included within non-directive counseling. As we explained in our brief, we think that that is read to mean that referrals and information can be given at the same time as pregnancy counseling, but that certainly doesn't overturn the agency's consistent understanding. Is that in part because the included language, that clause, the description of included in non-directive counseling refers to the last antecedent, so it refers to courses. It's not referring back to abortion counseling or referrals. It's describing what abortion is related to, not what counseling and referrals relates to. The included clause refers to courses described in, assuming that would be abortion or carrying the child to term. Those are the courses that are included in non-directive counseling. Yes, Your Honor, that is. In general, Your Honor, the consistent practice of the agency has been to treat non-directive pregnancy counseling and referrals as distinct activities, and that was true even under the 2000 regulations. I would refer Your Honor to the preamble to the 2000 regulations where it's very clear that referral for abortion and abortion information and counseling are dealt with under two separate sections. The non-directive counseling provision is discussed in the context of counseling, but is not a basis for requiring referral as plaintiffs would have it, and that makes sense, Your Honor. So does the patient know which of the positions that she's being referred to perform abortions? No, Your Honor. Then how is that providing the patient full disclosure of all relevant information? Your Honor, the referral that you're speaking of in the list refers to, if you'll pardon the verb, is the referral list is directed toward the rules requirement that any patient who presents as pregnant at a Title X clinic that is not able to provide care for a pregnant client is referred to an appropriate provider for evaluation of any medical needs arising from pregnancy. But the list that the patient is given, that patient doesn't know which doctor could provide an abortion if that's what she wanted. Right, because the point of the list is to refer the patient. So she then needs to go down the list and call everybody and figure out, even if she's expressed that an abortion is what she chooses to do? Yes, Your Honor. If she chooses to undertake activities outside of the Title X program, that is information that she'll have to seek outside of the Title X program. Congress has required that a limitation on the Title X program is that funds not be used to promote abortion as a method of family planning. So the agency, as it did in Rust, interpreted Section 1008 to prohibit referrals that would facilitate abortion. But Rust was before the noninterference mandate. The appropriation writer that directs that any pregnancy counseling that's provided be nondirective. It does not mandate pregnancy counseling at all. How is referral to prenatal care not nondirective toward one option over another? A very good question, Your Honor, and there are several reasons. First and foremost, that referrals are just simply not contemplated by nondirective counseling, which applies only to counseling, but a referral for prenatal care for a patient who presents a condition that can't be treated in the Title X context. It's not a pregnancy clinic. It is a pre-pregnancy family planning clinic. The agency has directed providers to provide a referral for care for the patient while she is pregnant outside of the program. And that does not direct any decision about her pregnancy, and it's not as a part of pregnancy counseling provided under the Title X program. It's simply as if a person who presents at a Title X clinic and needs an abortion. Okay, you're pregnant. Here's your referral for prenatal care. That's your option. Or here's a list of referrals, and we're not going to tell you which of these doctors may provide an abortion if that's your choice. Your Honor. That's not a full comprehensive counseling of that patient. That's interference with the physician-patient relationship. No, Your Honor. Particularly where you said she's got to call this list, I guess, and figure out who might perform an abortion. She's probably not going to ask them on the phone, so she'd have to make an appointment. She'd probably get one that doesn't. Odds are, because the majority on that list don't. Then she's got to run through all that, try to go to the next one. Time is of the essence as well. That may be. That is. And the Supreme Court addressed that issue in Rust. It wouldn't have because the noninterference mandate wasn't in effect when Rust was. You're correct, Your Honor, that Rust did not address the appropriations writer. But it did address precisely these arguments about an interference with the relationship between the doctor and patient, and the court found it didn't. Title X simply imposes limits on what Congress chooses to fund and what it hasn't funded. The list we're talking about, nothing in the final rule requires this list of abortion providers and nonabortion providers. That's merely permissive. So if the city of Baltimore wishes to provide that list, they may. But certainly if they thought that it was either misleading or would cause a waste of time, they're not required to provide that list. No. The only thing they're required. Then she wouldn't have any information about abortion as an option. That's right, Your Honor, that she would not have a referral at all for abortion. I mean, she barely has a referral anyway. She has a referral for pregnancy care while she's pregnant. But she does not have a referral for abortion as Section 1008 has been interpreted by the agency and upheld by the Supreme Court. If there's any concern by the provider that the provision of a prenatal referral is confusing or misleading, the agency and the preamble and the Supreme Court and Rust. Because the patient is not told which doctors would provide abortions on that list, even if she has said that that is her preferred course. So how is that not misleading? May I answer that question? Yes, please. I see my time is up. The agency has answered that question and the preamble to the final rule. The Supreme Court has answered that question about whether it's misleading. And what's the answer? The first answer is that the provider can make sure that it's not misleading. We do not provide abortion as a method of family planning. I cannot give you an abortion referral. I'm not saying anything with respect to your choice about what to do here. All that would follow nondirective counseling where they were able to talk about the pros and cons of all available options. If there's any confusion at that point. Do they talk about the pros and cons of all available options if the patient doesn't bring up abortion? Your Honor, the Title X program and the definitions of the rule require that all family planning be voluntary. So I think it would depend on the circumstances of the inquiry from the patient and the providers. So the answer is no. Unless the patient brings it up, they do not discuss the option of abortion? Your Honor, it would depend on the type of questions from the patient and the information that the providers have. So you're saying they're not prohibited from mentioning it? Oh, absolutely not. And I want to make that abundantly clear. That the nondirective counseling mandate is fully consistent with the pregnancy counseling that is authorized by the rule. That pregnancy counseling can include a discussion of abortion where it is appropriate. And that's up to the Title X provider. So the City of Baltimore, they are the ones that make the decision about what to include in pregnancy counseling. The HHS is not dictating what the City of Baltimore does with respect to discussing the pros and cons of abortion. That's up to the City of Baltimore. As long as it is nondirective. So it can discuss factually neutral information, the pros and cons, but cannot direct or steer the patient. No, they can only direct or steer them toward prenatal care. No, Your Honor. The rule permits referrals for abortion where there is a medical need. In the cases of incest and rape, it permits referrals for prenatal counseling to deal with medical conditions associated with pregnancy regardless of whether the patient later seeks an abortion. And you read lights on, and that's my fault. I'm sorry. I will hear from, we will hear from Mr. Flowers now. And you have time in rebuttal. Thank you. May it please the Court, Ben Flowers on behalf of the Amici States. I first want to thank the Court for allowing the Amici States five minutes today to discuss our interests. There are two interests that I think highlight the legislative bargain that led to Title X and also show that the rules are going to work in practice. I'll start with the legislative bargain. The many state laws that we highlight in our brief show that our citizens have a profound concern with any public funding going towards abortion. That's pro-life and pro-choice citizens alike. And because of that, the states have the same interest. Federal law reflects the very same interest. When Title X was passed in 1970, abortion was still illegal in some states. Elsewhere, it would have been a controversial practice. And so in order to get the bill passed, Congressman Dingell, one of the principal sponsors, proposed an amendment that's today 1008. What that amendment says is no Title X funding will go to programs where abortion is a method of family planning. And Congressman Dingell expressly said this was designed to keep the program from encouraging or promoting abortion in any way. That interest remains today. We see it in our laws, and it has remained throughout the period. The Affordable Care Act, for example, never would have passed if it were understood to funnel money to promote abortion. Indeed, the only way they were able to get it to pass was to make concessions, taking away funding for abortion. What interest still exists today? The citizens of our states, as reflected in our laws, have an interest in keeping their taxpayer money from going to funding. As reflected in what? State laws and in Title X itself. We're saying the interest that you see in our state laws is also in Title X. To get to the practical concern, when I said the rules will work, I can use Ohio to illustrate the state I'm most familiar with. Ohio is a grantee of Title X funds, as are most of the amici. We take Title X funds. We subgrant them to 37 entities. On Monday, I was able to confirm that all 37 subgrantees, six of them private, have said that they'll remain in the program. That shows two things, I think. First, there's not going to be coverage gaps. While some may drop out, others will be able to provide these services. Indeed, if there are coverage gaps, the states can fill those gaps. Ohio, for example, is seeking more granting to fill any gaps that may be left if Planned Parenthood stops providing. Planned Parenthood has stopped receiving Title X funding in a number of places in order to avoid what it describes as the withholding of important information from patients that is unethical and dangerous. Two points to that. First, yes, they are in Ohio. The rule has worked in the way that your clients want it to work. The way our clients want it to work, as evidenced by Planned Parenthood. No more Planned Parenthood. That's not correct. What our clients are concerned with is keeping taxpayer money from going to them. There's no law that bans Planned Parenthood in the state of Ohio or, to my knowledge, any other state. But what's critical to recognize, we're seeking more grant funds. We are going to target those family planning services in the areas where Planned Parenthood may no longer provide family planning services. You said there were how many family planning services in Ohio that say they're still going to? The subgrantees, it's 37. Thirty-seven? Thirty-seven. Six of them private, and I think that goes to the ethical concern. You talked about that. I understand that ACOG and ANA. What's the nature of the private entities? They're clinics that provide health services of various kinds. They're not all the same, so it's hard to answer that generally speaking. Health services of, okay, go ahead. To the public. So, for example, some of them go to departments of health, which are, of course, public, that will provide vaccines and other services. The private ones may be clinics. There's one in Ashtabula I know where folks can go to provide the family planning services you'd otherwise get at a department of health. Ashtabula? Ashtabula. I believe that's right. All this information. In Ohio? Yes. But with respect to the ethics, I think what this also shows, and particularly with respect to the private subgrantees, is that they don't see the ethical conflict between the new rules and the provision of services that the amici on the other side and the parties on the other side warn about. In the red brief, they liken these regulations to something you'd see in the Third Reich. With all respect, that's ridiculous. It's what you see in Ohio. You have a department of health, doctors with good people who care about patient health. Did the doctors who don't find this to be unethical and dangerous, did they seek to file an amici? Am I missing it? It was an expedited case, so I think we're the only ones who did. I'm not aware of any. But more importantly, the best evidence. Well, no, doctors filed an amici in support of the city of Baltimore. They were bottom side, so they had more notice. But the key point is the revealed preferences. They're still taking the money. And I'm happy to address any other questions the courts have. Again, I know you're already going over time by letting us participate, but if there's nothing further, I can have a seat. We want to hear as much as you want to talk. Are you finished? That's all I had. Do you have any questions? Thank you. All right. Mr. Tutte? Yes, Your Honor. Thank you, Your Honor. May it please the court, just a quick timing issue. Five minutes of the 25 minutes for the city of Baltimore will be taken by the American College of Obstetricians and Gynecologists, and they will be arguing about the counseling provision and its relationship with medical ethics. The doctor-patient relationship, that is the relationship of full disclosure and mutual trust between doctors and their patients, is one of the most important relationships in a person's life. And that is why Congress has repeatedly barred HHS from manipulating the information that doctors provide to patients during pregnancy counseling in the Title X program. So you sort of start there, and so I was going to come back to it, but I'll start there as well. The full disclosure, which is part of the noninterference mandate, as you describe it, and you indicate that any limitations on the doctor's ability to convey information to the patient, that's an interference and that's what violates the noninterference mandate. I still understand that to sort of be the argument. Help me understand why the requirement that pregnancy counseling be non-directed doesn't similarly violate that, under your reading, doesn't similarly violate the full disclosure because we think of a doctor who is unable to provide a suggestion or opinion or advice, however you want to describe non-directive, with respect to the chosen option of the three or more options that are available, that that's a limitation on disclosure, the disclosure being the doctor's opinion about whether they should or should not have an abortion. Your Honor, the answer is that the noninterference mandate is a negative prohibition on government interference. So it says that the government may not interfere with communications between patients and providers regarding the full range of treatment options. And so when the non-directive mandate then says that all pregnancy counseling shall be non-directive, it actually imports a medical term. So non-directive counseling is not a word that is thrown around a lot in the general lexicon because it's a medical term of art. It's a technical term. And it refers to a type of counseling that happens between patients and providers. Specifically, as HHS said in the rules preamble, non-directive counseling is the meaningful presentation of options. But without suggesting the doctor's opinion. Well, it's, I think, probably a little more complicated than that. But yes, basically. I mean, if I'm wrong, tell me I'm wrong. But it doesn't permit the expression of an opinion or advice, get an abortion. Absolutely. Give an adoption. That's what the doctor can't do. And so that non-directive aspect of that is a limitation on the full disclosure by a doctor to his patient. The doctor can't disclose, I think you should have an abortion. I think you should have given the child up for adoption. That limitation, in some sense, is a limitation on, under your expansive reading, full disclosure. Your Honor, at best that would mean that the two statutes are in conflict. But on this issue, if you apply either statute, Baltimore wins and HHS's rule is unlawful. Either doctors need to comply with the non-directive mandate and thereby provide pregnancy counseling on a neutral basis. Okay, I understand that. Instead of the alternative argument, I want to know from your position whether you agree that the final rule says non-directive counseling may take place. Is the limitation on counseling to be non-directive? So that's a rule issued by HHS. Does that, in your view, violate the 1554 non-interference mandate? No, Your Honor. Why not? Non-directive counseling provision prevents HHS from mandating that a particular option be emphasized during pregnancy counseling in the Title X program. It says that all pregnancy counseling shall be non-directive. Is it your position that the city of Baltimore then can choose? Because HHS can't mandate it, but the city of Baltimore can choose to advocate for abortion for every patient? The government has actually said that. Is that your position? No, Your Honor. Right, because you're limited by non-directive. Your counseling can only be non-directive, right? Your Honor, we are bound by the regulations that are made by HHS, and HHS has said that all pregnancy counseling shall be non-directive. I guess I'm not fully grasping your question. If you're saying that because non-directive counseling prohibits HHS from requiring physicians to emphasize one option over another, but you're talking about the flip side, which is could it then ban physicians from giving their best advice about what they think the proper option would be? Now, we think that that independently would violate medical ethics and any number of other separate issues. You think a doctor in Baltimore, based on their opinion, can, as part of non-directive counseling, advise a patient that they should get an abortion? No, Your Honor. What we are saying is that the non-directive mandate requires that all pregnancy counseling be non-directive, which is a medical term of art that means that you present a meaningful set of options to patients. Your question is about whether the non-interference mandate, which says that HHS may not promulgate any regulation that interferes with full communications between patients and providers, might conflict with that mandate. But even if they conflicted, because both operate to prohibit HHS, that would mean that either it violates one or it violates the other. Either the non-interference mandate has been violated because HHS is seeking to interfere with the full range of communications between doctors and their patients, or the non-directive counseling mandate has been violated. Now, I think I heard government counsel describe this as neutral counseling between the physician and patient. Maybe she didn't say that, but is it? No, Your Honor. This doesn't comply with HHS's own definition of what non-directive counseling is in the preamble to the rule. It also doesn't conform to the medically accepted definition of non-directive counseling, as ACOG will speak to. And how does it not conform to what's in the preamble? Your Honor, the preamble says that non-directive counseling is the meaningful presentation of options. Later in the preamble, it says that such counseling is neutral, and that it must be unbiased. And specifically in reference to abortion, saying that there should be no sort of tacit pushing toward abortion. But I believe that that is a definition that applies to both sides. The idea is that non-directive counseling doesn't emphasize one option or another, doesn't tacitly put a thumb on the scale toward a referral for prenatal care, or a referral for adoption, or a referral for abortion. I had a question about that, counsel, in the scope of this argument about the referrals being directive. If the regulation did not require prenatal referrals, so the only referral we're talking about is this list, would it be directive under your argument? Yes, Your Honor. We see the inability to provide a referral, because a referral is counseling about where to get further treatment. Sorry, just so I understand. So you're saying even if there was no prenatal referral requirement, there was no referral requirement at all, there's just a requirement that if you're going to provide a list of referrals, that list has to be balanced, as this regulation says, in the way that the regulation says it should be. But that is, your argument is that's still directive, towards one option over another. Yes, Your Honor. And partially that's because non-directive counseling is the culmination of a counseling session, when a referral is made at the culmination of a counseling session, where options are presented. And the patient says, that option isn't for me. That option is the option I would like to select. And so any referral requirement that then required the medical provider to present a referral for everything, when in fact the patient has selected a single option, and said that's the option I would like to pursue, that's directive. That both eviscerates the trust that that patient has in the doctor, because the doctor is not putting their best interests first, which is the purpose of the doctor-patient relationship. So if you make a referral for five things that are not relevant to what I've selected, you're telling me that my interests aren't your first priority. This whole thing strikes me as interfering with the doctor-patient relationship. None of us, well maybe somebody at one of those tables is a doctor, but there's a bunch of lawyers sitting around talking about what's best in a physician-patient relationship. How is that not interfering with the physician-patient relationship, and what a doctor can or cannot do or is required to do? Absolutely, Your Honor. And medical associations across the United States, the leading medical associations... Sorry to interrupt you, Counsel. Isn't that a reason why this should have been raised before the agency? If the discussion of medicine and the doctor-patient relationship and ethics under 1554 seems like it's really something the agency would have expertise about, and 1554 wasn't raised is my understanding. So, Your Honor, it was raised. It was raised in substance. It was raised in every way that counts, but the citation to 1554 or 18114, because it goes by two different names, was not made. So the legal... Doesn't the government acknowledge that they consider the Affordable Care Act? Yes, Your Honor. So they admitted that they considered the legal obligations under 1554? They submitted in the administrative record that they had considered the Affordable Care Act in formulating the rule. More importantly... Were they then entitled to deference on that under Chevron? If we accept your posit that they... If we take the generic citation to the ACA as consideration of every part of the ACA, right, everything that's in it, don't they then get deference for having considered and rejected those arguments and adopting the final rule that they did? Although that we... The government may say that Chevron doesn't apply. Whether Chevron applies or not, yes, I think that the Chevron analysis would still go our way. So accepting that Chevron might apply, although we wouldn't say so, we think that... If they considered... I mean, that's sort of the import of... It's sort of you get to pick one or the other. Well, not the hypothetical, right? You get one or the other. Either you avoid waiver by saying it was considered and you avoid waiver. But if you do that, then you've got to say that it was considered and now they get Chevron deference. But they cannot survive Chevron deference, Your Honor. They cannot... I understand that argument. And let me say why. The noninterference mandate says, violates the principles of informed consent and the ethical standards of medical professionals. So that is the statute. It says the principles of informed consent and the ethical standards of medical professionals. That's not Congress's judgment and that's not HHS's judgment. That is intended to import the widely accepted ethical standards of the medical profession, which were put before the agency. And the agency did consider, although not in the context of the 1554 mandate, but the AMA, ACOG, AAP, every leading nonpartisan medical association put comments before the agency saying, this will cause physicians to be in an ethically compromised situation. And HHS, who's the sort of subject matter expert, to the extent there is one, not this group of three, considered those and rejected those arguments. And the arbitrary and capricious challenge is not before the court, but it said it in a conclusory manner and said, well, Rust upheld title 1008 as ambiguous and said it was a permissible interpretation. And then they say, and it never would have done that if it violated medical ethics. That's not HHS applying its ethical standards. That's not HHS making any considered judgment about ethical standards. The ethical standards were put before it by literally the group that writes the ethical standards, the American Medical Association, and ACOG, whose guidance they have imported in their quality family planning guidelines, that they did not explicitly say that they were ignoring in the rule. So they just don't even discuss the fact that they have controlling guidance that says the opposite of what the rule provides. This might be a better question for your colleague, but I'll ask you. So the ABA, just because I know more about lawyers than doctors, if the ABA issues an ethical guidance that says that a judge, for example, needs to do a certain thing, that's not binding on me. It's sort of an industry group, and it's persuasive or not persuasive. It may depend state by state. Some states adopt it, some states don't. If a state adopts it, then it matters. But the ABA's suggestion of what someone's ethical obligations are are interesting but in no way sort of controlling of the question. Isn't that the same thing for the AMA, and you keep calling them ACOG? I'm not sure what that is. The American College of Obstetricians and Gynecologists. ACOG and AMA and any other set of initials that we want to talk about. Aren't they similarly situated to the ABA? I will say ACOG represents 90% of obstetricians and gynecologists in the United States as members. So it's like the ABA for obstetricians and gynecologists. So they're experts in their field. Yes, Your Honor. And to your point, it's the statute that says look to some ethical standards of medical professionals and apply that in determining whether or not a woman is violent. I understand your argument. I just want to make sure I'm understanding. Because you could imagine that it's something more than that. But their sort of provisions are similar to the ABA's in that they are highly persuasive, really interesting, but not, strictly speaking, binding on any given doctor. Yes, I would say that that is correct. There are doctors who apply a wide range of ethical views, but they are the consensus position of the profession. I very much accept that. I'm not trying to challenge that. I'm just making sure I understand where it stands. What percentage did you say they represent? Over 90%. So it's this other 10% that didn't file a brief. That's correct, Your Honor. And I do want to just return to the fact that this requirements in the rule are directive counseling in any way that you slice it. So first, it's directive because it emphasizes one option over another by mandating prenatal referrals, even if the patient goes in. I'm going to interrupt again. Yes, Your Honor. I was interested in the government's argument about how referrals and counseling have always been treated differently, and they pointed to, they said, even in the 2003 regulation and the preamble, and I wanted to hear your thoughts on that. Yes, Your Honor. We believe that counseling encompasses counseling about further care, which is also known as a referral. Congress has repeatedly paired counseling and referrals in many statutes, but we note that the only other place that non-directive counseling appears in the United States Code, they say included in other courses of action. Repeatedly paired, you mean they refer to them separately? They say they always treat them as actually unitary, but they're a pair. So it's like counseling and referral upon request. So they're often treated as sort of a single unit or idea. So it's counseling and referral. It's kind of like before 2007 in the Federal Rules of Procedure, it said for cause, for good cause, for cause shown. They all meant the same thing. And actually, we think that the statutory history strongly favors Baltimore. And this hasn't really been fully developed in the briefing, in the side sort of back and forth, just because there isn't always a chance to develop it. But Congress repeatedly, repeatedly tried to enact a law that repealed and made it impossible to ever again reenact the 1988 rule. In 1990, they first introduced the Pregnancy Counseling Act. Then in 1991, they introduced appropriations riders that were designed to rescind the rule. In 1992, the Family Planning Amendments. In 1993, another introduction of the Family Planning Amendments. In 1995, another introduction of the Family Planning Amendments. Then in 1996, the rider is enacted, and never again did Congress attempt to pass another one of these laws. We think that that is strong evidence that the limitation, the non-directive mandate, is the culmination of that legislative agenda. Under the rider, a doctor at one of your facilities, are they permitted to give their advice to a patient that abortion is the appropriate course of action? You mean under the new rule? Well, I was talking about the rider, but it's the same thing, I think, under the rule. There's a distinction there, tell me. There can be, and I don't want to speak out of turn, but there can be a situation where a doctor would say, among your options, because you will otherwise die, for instance. So the health exception. Sure, that would come within, but it would also be within the statutory meaning, right? Because that's a regulatory exception. If it means that, but otherwise, so I accept that one. We can also take rape and incest and put those in a bucket. So I understand those three, health, rape, incest. Maybe there's another one, but I get it. My question is the sort of more generic case. Patient comes in, non-directive counseling, doctor talks about all the options. At the end, are they permitted to say, I want to give you the advice that the appropriate course of action for you, having talked to you, in my medical opinion, is that you get an abortion? They are not supposed to do that, and that would violate the non-directive mandate. No, no, that would violate the non-directive mandate. That would violate it, and in the 2000 rule, actually this was addressed on 65 Federal Register 41273. I'd say that, sorry. 65 Federal Register 41273. There is discussion about, could we counsel keep the baby? Obviously, that comes from the other side, and they said no, that would be inconsistent with the non-directive mandate. And they also said that totally omitting information about an option would be inconsistent with the mandate. And so to the degree the government's argument, the government conceded in California v. Czar in the district court that if referral is a part of counseling, then the rule violates the non-directive mandate. I see your yellow lights on. Well, actually, I have a question. I want to take you in a different direction. What evidence have you presented demonstrating the statewide nature of the injunction as appropriate, as opposed to just Baltimore City? Yes, Your Honor, we have a declarant who speaks to the fact that individuals from outside of Baltimore make use of Baltimore's medical services, and that if the rule were to take effect, which it ultimately did, that those individuals would be more likely to use Baltimore's services, would impose a financial. Yeah, I've seen that. That's your only evidence? That was our evidence. And that it would eviscerate patient trust wherever it's found, which is also an irreparable harm that inures in common to all Title X providers, but is a serious and irreparable harm to Baltimore. But, yes, that patients would come from outside the jurisdiction, and that Baltimore could never recapture that patient trust that would be lost if patients began to believe that their doctors didn't put their interests first. So that was the reason for that. Can you respond? Maybe I'm mistaken here, but the State of Maryland sought relief under this rule in a different action. Can you talk about those seem a little inconsistent, right? The State of Maryland tries to get that injunction. It's denied in a different circuit. And then you come in and you say, yes, we're a smaller subset, I understand Judge Thacker's point, but go ahead and give us the whole state because we sort of want a second bite of the apple. Respond to that argument. Yes, Your Honor. Well, I think that Baltimore's decision to pursue its own relief ultimately proved pressure. The Ninth Circuit stayed Maryland's relief, we think, incorrectly. And we have no power to influence Maryland's decisions. In fact, Maryland has withdrawn from the Title X program. They did so a few days ago. When they did so, we as their subgrantee were also involuntarily taken out of the Title X program. Baltimore has been struggling to stay in the Title X program, hoping to see the rule vacated, a return to the 2000 regulations. But because Baltimore was unsuccessful in procuring an injunction and Maryland was unsuccessful in procuring an injunction, ultimately Maryland has left the program because of its inability to comply with the rule. Does that mean why is the case not moved if you're no longer a grantee, a subgrantee? I'm sorry, I didn't realize all this had happened. Doesn't that create a disability problem for us? No, it does not, Your Honor. Baltimore is still harmed by the rule. Baltimore still would like to be a grantee in the Title X program. A potential grantee. Evidence of the harm is that Planned Parenthood has withdrawn. Yes, Your Honor. Planned Parenthood has withdrawn, which is 40% of the Title X program clinics. 1.6 million patients served annually no longer have access to that provider. This is one of the new news about the state. If we rule in your favor, you're still not going to get Title X money because Maryland has withdrawn. Well, we will obviously immediately seek to reenter the program either as a direct grantee, which we can do, or Maryland will reenter the program and then we will again be a subgrantee of Maryland. So as a city you can seek to become a direct grantee even though your state is not. Yes, and speaking to Ohio's point, two clinics have closed in a major city in Ohio. I thought he said all 37 were still in business. All 37 of Ohio's subgrantees are still in business. Not all of the clinics remain. How many clinics have closed in Ohio? I don't know. He said two in a major city. What city? Columbus, I believe. This is news reporting on what's happening. I should read the news. Careful. I know. I see that my red light is on, but if there are any further questions, I'd be happy to answer them. No, we're good. Thank you. Thank you. All right. We urge you to affirm. Thank you. All right, counsel. May it please the court. Doug Hallward-Dreemacher on behalf of the Amici Professional Associations. Are you a doctor? I am not a doctor, Your Honor, although I do represent over a quarter million doctors, including, as my friend said, 90% of the OBGYNs. And I want to start with a point of agreement with the government. The government said that when Congress used the phrase non-directive counseling in the appropriations rider, which it has done every year since 1996, it used the term of art. It did use the term of art, and it is a term of medical art. It is a term that was introduced into the regulatory regime here by my client, the American College of Obstetricians and Gynecologists, or ACOG. Because in the 1981 guidelines, which ACOG developed as the lead on a joint committee to develop those, that was where the phrase non-directive counseling first was introduced. And it is a phrase that has meaning as a matter of medical ethics. And that meaning is not consistent with the notion that there is non-directive counseling, but directive referral. That is an oxymoron, Your Honor. Non-directive counseling results in a referral for the services that are requested by the patient as a consequence of the complete and unbiased information that the patient is provided. And that is why each of those statutory and regulatory references to non-directive counseling paired with referral all specify that the referral is upon request, or as she so requests. Where does the as requested come from? In the 1981 guidelines, it was... It is not in the rule of the statute or anywhere else. It is in all of the documents that Congress would have had before it when it used the phrase non-directive counseling. Non-directive counseling and referral upon request is what all of those documents refer to. And the upon request is what clarifies... This doesn't mean that, as the government hypothesizes, that counseling and referral are just two totally different things. What it means is that the referral, that is the culmination of the counseling, is the referral for the services requested by the patient. That's what non-directive means. When it's non-directive counseling, you're giving all of the options, all of the information. The patient makes a determination about what course of action they want to follow. And the referral tracks the patient's request. So all of those references to non-directive counseling are paired with referral upon request, or as she requests, to highlight that the referral comes out of the patient. Yes, Your Honor. Does this program add a different twist? Because the Title X program is a family planning program. So it doesn't cover the entire OB-GYN relationship. So once a client becomes pregnant, she has to be referred out, right? Whether she requests a referral, whether she knows what she wants to do or not. She may not know what she wants to do about the pregnancy, but she cannot receive the medical advice she needs in the Title X program anymore. So does that affect the sort of referral upon request concept here? I agree, Your Honor, that referral is necessarily part of the counseling that's being provided. Because at a certain point, as Your Honor says, it stops. The services that can be provided under the program stop. And AMA, Code of Ethics, it's a fundamental premise of medical ethics that doctors must make a transition of care where their own care must stop. And that can be for a number of reasons. The doctor-patient relationship broke down, a matter of conscience on the part of the doctor. But where the care is going to end, the doctor has an ethical obligation to make the transition to a new service provider. And medical ethics would preclude the doctor from making a referral to somebody who could not provide the relevant medical services, which are the ones that the patient has requested. And if the patient is pregnant, so has to be referred out of the program because she's pregnant, for continuation of care, say for the next 24 hours or the next week or however long, would she need to be referred to a doctor who takes care of pregnant people? She would not. Well, what the regulation requires is referral to prenatal care. And that is not medically appropriate for a woman who has already made the determination to terminate the pregnancy. Prenatal care is not medically indicated. And so to make a referral for an unnecessary service would be inconsistent with the medical ethics. Can I ask a separate question? I understand you're not a doctor, but you're sort of playing one here. So is there a scenario, to the extent you know, where a totally hypothetical, where a woman decides to get an abortion, but it's going to be some time, it can't happen instantaneously, that that woman, because of preexisting health conditions, requires care? And so I think about like a pregnant woman who has like autoimmune disease, where the pregnancy can actually not just endanger the life, you know, the child, but the mother or the pregnant woman herself by virtue of the fact that she is going to remain pregnant for some period of time. Is that, would that be a scenario where you would say that you need, because of preexisting conditions of the woman, that she needs to be sent for prenatal care to ensure her own health, at least until an abortion takes place? Maybe it's quibbling, but I don't think that would be prenatal care. I do believe that Your Honor has hypothesized a rather rare, I would imagine, circumstance in which, because of the delay in terminating the pregnancy, there is some other care that the patient needs in the meantime. And yes, medical ethics would call on the doctor to refer her to that care that is appropriate for her in the intervening time. But I don't think that would be prenatal care, which connotes care for the fetus. And so... In your opinion, prenatal care, and I'll stop. I apologize, Judge. But prenatal care only cares for the fetus, not the mother. So, like, the things that they do for a pregnant woman under prenatal care, that's not limited to taking care of the child. I mean, they're also trying to take care of the pregnant woman. Again, I think that what the doctor is called to do as a matter of medical ethics is to refer her to the care that is appropriate to her in that circumstance, which is not care for the fetus because of her determination that she is going to terminate. I do want to make one point about the statute, the Infant Adoption Awareness Statute. It says, included in non-directed counseling to pregnant women, what it also makes clear, though, is that information and referrals must be provided on an equal basis. And so what Congress is reflecting in that statute is a recognition that information and referrals are part of the counseling that, because of the non-directive mandate, must be provided on an equal basis to patients. That means taking the direction from the patient that is inconsistent with a regulatory regime in which the direction is that of the government. If there are no further questions, Your Honor, thank you. All right, Ms. Lilly, you have time. Yes, Your Honor, just a few quick points. At this stage, the overwhelming majority of Title X providers have remained in the program, despite the enforcement of the rule. So if it were true that medical ethics prohibited them from complying with the rule's requirements, all of the providers would not be able to remain in the program. Maybe they want to provide care for their patients instead of leaving them hanging. Maybe that's the reason. But if they were prohibited by medical ethics from engaging in pregnancy counseling and declining to provide an abortion referral, I think we would see a different outcome at this point. Your Honor, to the extent that Your Honor, Judge Richardson is correct, that the purpose of the prenatal referral is for care for the patient while she is pregnant, regardless of any subsequent decisions about the pregnancy. And the provider can make that clear. I'm giving you a prenatal referral requirement for your own health while you remain pregnant. I'm not making any suggestions about your ultimate decision. That's part of the disclaimers that the rule permits. Permits, Your Honor. But again, up to the individual doctor to ensure that it is ultimately non-directed. So if Baltimore or any provider that participates in the Title X program is concerned about the prenatal referral requirement being confused, being confusing, it can make that clear. Are there no further questions, Your Honor? Thank you.
judges: Stephanie D. Thacker, Julius N. Richardson, Allison J. Rushing